UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MONSTER ENERGY COMPANY,<br><br>                    Plaintiff,<br>   v.<br><br>PELMIR ENTERPRISE INC., d/b/a MONSTER DOLLAR,<br><br>                    Defendant. | CASE NO. 2:22-CV-00524-LK<br><br>ORDER DENYING MOTION FOR DEFAULT JUDGMENT AND MOTION TO SEAL |

      Before the Court are Plaintiff Monster Energy Company's Motion for Default Judgment, Dkt. No. 16, and Motion to Seal, Dkt. No. 18. Defendant Pelmir Enterprise Inc. has not filed a response to the motion, nor has it otherwise appeared in this action. Having reviewed the motion, the relevant portions of the record, and the governing law, the Court DENIES Monster's motion for default judgment without prejudice and DENIES Monster's motion to seal as moot.

**I.      BACKGROUND**

      Monster is in the business of developing, marketing, selling, and distributing beverages, including energy drinks. Dkt. No. 1 at 3. It owns several federally registered trademarks (the

"MONSTER Marks") that it uses on its beverages and on other products such as clothing, accessories, and sports gear. *Id.* at 3-10; *see* Dkt. No. 1-1 (registration certificates). Some examples of the MONSTER Marks include: the words "MONSTER ENERGY" in standard font; the word "MONSTER" in a stylized font with a slash mark through the letter "O"; and the stylized letter "M" in the form of a claw above the stylized word "MONSTER," which is above the word "ENERGY." Dkt. No. 1 at 4, 9 (table depicting examples); *see also, e.g.*, Dkt. No. 1-1 at 65, 67, 70.

In 2002, Monster launched its line of Monster Energy drinks and has since applied its "now-famous"[1] MONSTER Marks to its energy drinks. Dkt. No. 1 at 3. Monster has also "consistently used a distinctive trade dress for its products, packaging, and promotional materials using the colors green, black, and/or white" with its "M" claw icon and the word "MONSTER" (the "MONSTER Trade Dress"). *Id.* at 10; *see also id.* at 11–12 (including examples). Monster uses its MONSTER Marks and/or MONSTER Trade Dress in connection with its beverages and a variety of other goods and services, including clothing, accessories, sports gear, restaurant services, and the promotion of sports and music events, among other things. *See id.* at 3, 11.

According to Monster, it has spent over $9.8 billion dollars in advertising, promoting, and marketing its MONSTER brand since 2002. *Id.* at 12. Monster features its MONSTER Marks and MONSTER Trade Dress in its marketing and promotion efforts, which include, among other things, "sponsorship and promotion of athletes, music festivals, sports events, and other live events that are televised nationwide and internationally[.]" *Id.* As a result of its efforts, Monster has "achieved extensive exposure and widespread recognition of its MONSTER™ brand," its

---

[1] *But see Monster Energy Co. v. Pimmonster LLC*, Opp. No. 91253709, 2022 WL 72404, at *14 (Jan. 6, 2022) (holding that Monster "did not submit sufficient evidence to support a finding that the Monster Energy Marks are famous for clothing, bags and beverageware"); *Monster Energy Co. v. Chih*, Opp. Nos. 91205893 91205924, 2016 WL 740936, at *11 (Feb. 1, 2016) (finding marks not famous for more than one type of goods and/or services as of 2016).

ORDER DENYING MOTION FOR DEFAULT JUDGMENT AND MOTION TO SEAL - 2

"MONSTER line of drinks has achieved substantial commercial success," and "[t]here is a high demand for merchandise bearing Monster's MONSTER Marks and MONSTER Trade Dress." *Id.* at 3, 12–13.

Pelmir operates a retail store under the name "Monster Dollar" in Kent, Washington. *Id.* at 3, 13 (stating that Pelmir also owns and operates the website https://www.monsterdollar.net/ and maintains a social media profile at https://facebook.com/monsterdollar.net/). Pelmir's retail store sign contains the words "Monster Dollar" in large, green, standard font against a white background (the "MONSTER DOLLAR Mark"); a green triangle, inside of which are two red arrows and an infinity symbol (collectively, the "MONSTER DOLLAR Trade Dress"); and the Monster Dollar website address in small, red font. *See id.* at 13–14 (including a picture of the Monster Dollar sign).

On April 20, 2022, Monster commenced this lawsuit against Pelmir. Dkt. No. 1. Monster asserts claims for trade dress infringement, trademark infringement, and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Dkt. No. 1 ¶¶ 36-44); trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Dkt. No. 1 ¶¶ 45-52); unfair competition in violation of the Washington Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86.020; and common law unfair competition. Dkt. No. 1 at 17–19. According to Monster, Pelmir infringes on its MONSTER Marks and MONSTER Trade Dress "by promoting, advertising, selling, and/or offering to sell various products and services using the MONSTER DOLLAR" Mark and Trade Dress. *Id.* at 15. Monster further alleges that Pelmir's actions are likely to cause "confusion and mistake among customers and the public and to deceive the public into believing that [Pelmir]'s products and services are associated with, sponsored by, originated from, or are approved by, Monster, when they are not." *Id.* at 17–18.

Monster served a summons and copy of the complaint on Pelmir on April 25, 2022. Dkt. No. 13 1. Pelmir has not appeared in this action or responded to Monster's complaint. On June 27,

2022, Monster moved for entry of default against Pelmir, Dkt. No. 14, and the Clerk entered default on July 6, 2022, Dkt. No. 15. Monster now asks the Court to: (1) enter a default judgment against Pelmir; (2) award Monster's reasonable attorney fees and costs under 15 U.S.C. § 1117(a); and (3) permanently enjoin Pelmir from using any reproduction, counterfeit, copy, or colorable imitation of Monster's trademarks or trade dress to identify any goods not authorized by Monster. *See generally* Dkt. No. 16; *see also* Dkt. No. 1 at 2, 13–14.

## II. DISCUSSION

The Court considers Monster's motion for default judgment before turning to Monster's motion to seal.

### A. Motion for Default Judgment

The Court begins by discussing the relevant legal standard governing motions for default judgment before discussing the merits of Monster's motion.

#### 1. Legal Standard

Motions for default judgment are governed by Rule 55 of the Federal Rules of Civil Procedure. The Rule authorizes the Court to enter default judgment against a party that fails to appear or otherwise defend in an action. The court has discretion to grant or deny a motion for default judgment. *Hawaii Carpenters' Tr. Funds v. Stone*, 794 F.2d 508, 511–12 (9th Cir. 1986). Default judgments are ordinarily disfavored, and cases should be decided on their merits if reasonably possible. *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). Courts may consider the following factors (the "*Eitel* factors") in deciding whether to grant a motion for default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

1   *Id.* at 1471–72.

2   On default, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) (quoting *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977)). However, the plaintiff must establish the relief to which it is entitled. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). Accordingly, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

2. <u>Jurisdiction</u>

"To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

There can be no reasonable dispute that the Court has subject matter jurisdiction over this matter. The Court has federal question jurisdiction over Monster's claims for trademark infringement, trade dress infringement, and false designation of origin under the Lanham Act. 28 U.S.C. § 1331; *see also* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . and trademarks."). Additionally, the Court has supplemental jurisdiction over Monster's Washington State statutory and common law unfair competition claims because those claims are "so related" to the trademark, trade dress, and false designation claims as to "form part of the same case or controversy[.]" 28 U.S.C. § 1367(a).

The Court has personal jurisdiction over Pelmir because it is incorporated in Washington and has its principal place of business in Washington. *See* Dkt. No. 1 at 3; *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998) (a court may exercise general jurisdiction over a

defendant if the defendant is domiciled in the forum state); *AM Tr. v. UBS AG*, 681 F. App'x 587, 588 (9th Cir. 2017) ("[A] corporation is typically subject to general personal jurisdiction only in a forum where it is incorporated or where it maintains its principal place of business.").

        3.    <u>Whether the *Eitel* Factors Favor Default Judgment</u>

The Court begins with the second and third *Eitel* factors—the substantive merits of the plaintiff's claim and the sufficiency of the plaintiff's complaint—because these two factors alone justify denying Monster's motion for default judgment. These factors are frequently analyzed together. *See, e.g.*, *PepsiCo, Inc., v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002). For the second and third factors to weigh in favor of default judgment, the complaint's allegations must be sufficient to state a claim for relief. *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978). A complaint satisfies this standard when the claims cross the line from the conceivable to plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *see also id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (alteration original) (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007))); *In re Singh*, No. 10-42050-D-7, 2013 WL 5934299, at *3 (Bankr. E.D. Cal. Nov. 4, 2013) (stating that a "complaint [that] is well-pleaded and sets forth plausible facts—not just parroted statutory or boilerplate language," merits default judgment).

Therefore, for each cause of action Monster asserts, the Court must review the standards for stating plausible claims for relief and determine whether Monster's allegations are sufficient.

        *(a) Trademark Infringement Under 15 U.S.C. § 1114(1)(a)*

The Lanham Act prohibits the unauthorized "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such

use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a). To prevail on a trademark infringement claim, a plaintiff must show that it "holds a protectable mark, and that the alleged infringer's imitating mark is similar enough to cause confusion, or to cause mistake, or to deceive." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159 (9th Cir. 2021) (cleaned up).

Monster has provided evidence that it is the owner of the federally registered MONSTER Marks. Dkt. No. 1 at 4–10; Dkt. No. 1-1. Federal registration of a trademark constitutes prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration. *See* 15 U.S.C. § 1115(a); *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Because Pelmir has failed to contest Monster's proof of registration, the Court concludes that Monster has established the first element of its trademark infringement claim.

As for likelihood of confusion, the Court must determine whether "the similarity of the marks is likely to confuse customers about the source" of the goods or services. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (internal quotation marks omitted) (quoting *Off. Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993)); *see also Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (stating that courts consider "whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case.").[2] The Ninth Circuit assesses likelihood of confusion with reference to eight factors (commonly referred to as the "*Sleekcraft* factors"). *GoTo.com*, 202 F.3d at 1205. These factors include the (1) strength of the protected

---

[2] It is unclear from Monster's submissions whether it is claiming forward confusion or reverse confusion. *See Ironhawk*, 2 F.4th at 1159–60.

ORDER DENYING MOTION FOR DEFAULT JUDGMENT AND MOTION TO SEAL - 7

mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014). The *Sleekcraft* factors are non-exhaustive and applied flexibly; they are not intended to be a "rote checklist." *Rearden*, 683 F.3d at 1209; *see also Brookfield*, 174 F.3d at 1054 (cautioning that this eight-factor test is "pliant" because some factors "are much more important than others," and the importance of each individual factor is case-specific). "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden*, 683 F.3d at 1209.

Here, the Court cannot adequately assess whether Pelmir's use of the MONSTER DOLLAR Mark creates a likelihood of consumer confusion because Monster has made no attempt to establish the types of goods or services that Pelmir actually sells or advertises. *See generally* Dkt. No. 1. Monster merely alleges that Pelmir "is engaged in the business of operating a retail store under the name MONSTER DOLLAR that sells a variety of goods and services," and that Pelmir "promot[es], advertis[es], sell[s], and/or offer[s] to sell various products and services using the MONSTER DOLLAR [M]ark." *Id.* at 13, 15.[3]

"When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that

---

[3] Although Monster notes that Pelmir applied for registration of the MONSTER DOLLAR Mark "in connection with gloves, shirts, pants, and other articles of clothing," Dkt. No. 16 at 10, that trademark application was ultimately denied after Pelmir failed to respond to Monster's opposition, Dkt. No. 1 at 14, and Monster makes no effort to establish that Pelmir is currently using its MONSTER DOLLAR Mark to sell such products. *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) (the likelihood of confusion analysis requires the plaintiff to show that the defendant's "actual practice is likely to produce confusion in the minds of consumers").

confusion can be expected." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979), *abrogated on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003). However, "[i]f the goods are totally unrelated, there can be no infringement because confusion is unlikely." *Id.*; *see also eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1117 (W.D. Wash. 2006) ("[E]ven where the marks are identical, 'there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry.'" (quoting *Brookfield*, 174 F.3d at 1054)). Thus, without plausible allegations or evidence establishing the types of goods or services Pelmir allegedly uses its MONSTER DOLLAR Mark to sell and/or advertise, the Court cannot evaluate the *Sleekcraft* factor regarding the relatedness of the parties' goods or services. *See, e.g., Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005) (in considering whether goods or services are related, the court must consider "whether customers are 'likely to associate' the two product lines" and "whether the buying public could reasonably conclude that the products came from the same source" (quoting *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998))); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011) ("The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function.").

Similarly, without plausible allegations or evidence regarding the types of goods or services sold and the manner in which the MONSTER DOLLAR Mark is applied to or used to advertise/sell such products, the Court cannot adequately assess other *Sleekcraft* factors, namely: the degree of care a consumer would use in purchasing the parties' products; whether the parties' marketing channels are convergent; or the similarity of the parties' trademarks. *See, e.g., Surfvivor Media*, 406 F.3d at 634 (noting that the degree of consumer care varies based on the type of good or service at issue); *Pom Wonderful*, 775 F.3d at 1130 ("In assessing marketing channel

convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."); *GoTo.com*, 202 F.3d at 1206 (discussing how to evaluate the similarity of trademarks); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (noting that even identical marks may not be confusingly similar depending on "the way the marks are encountered in the marketplace and the circumstances surrounding the purchase" of the goods and services). However, the Court notes its skepticism that consumers would be confused by these two marks, even if certain *Sleekcraft* factors are satisfied. "[C]onfusion must be probable, not simply a possibility." *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620 (9th Cir. 2017) (cleaned up). The two marks share only the word "monster." And although "monster" is the dominant term in both marks, it is doubtful that this word alone renders the marks sufficiently similar that non-discerning consumers would be likely to assume a connection between the parties when encountering the marks in the marketplace. Rather, "monster" in connection with "dollar" suggests that a dollar might go further than in other stores, or that a consumer could expect to find a large selection of inexpensive items in the store. In contrast, "monster" as used in the MONSTER Marks gives a commercial impression of strength or power. And although the marks share the colors green and white, they otherwise appear dissimilar, especially considering MONSTER DOLLAR's use of different font, different letter case, and the red and green logo that bears no resemblance to the MONSTER Marks' design:

   

Dkt. No. 1 at 11, 14. Considered in their entireties, the marks are sufficiently dissimilar that

Monster would be well-advised to reconsider whether it is worthwhile to pursue this action.[4]

Accordingly, the Court concludes that Monster has failed to adequately plead a claim for trademark infringement under 15 U.S.C. § 1114(1)(a).

### (b) Trade Dress Infringement Under 15 U.S.C. § 1125(a)

"Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)). To state a claim for infringement of unregistered trade dress under 15 U.S.C. § 1125(a), Monster must demonstrate that: (1) its trade dress is nonfunctional; (2) its trade dress has acquired secondary meaning;[5] and (3) there is a substantial likelihood of confusion between its products and Pelmir's products. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018).

As discussed above, Monster has failed to allege sufficient facts showing Pelmir's mark and trade dress create a likelihood of consumer confusion. Nor has it established any date for its alleged secondary meaning or Pelmir's first infringing use. However, the Court need not address whether Monster's MONSTER Trade Dress is nonfunctional and distinctive because Monster's trade dress infringement claim fails for the same reasons its trademark infringement claim failed. As such, Monster is not entitled to default judgment on its claim for trade dress infringement under

---

[4] Although Monster asserts that "[t]he TTAB held there was a likelihood of confusion between Defendant's MONSTER DOLLAR mark and [the MONSTER Marks and MONSTER Trade Dress]," Dkt. No. 16 at 2, the TTAB entered judgment by default against Pelmir and sustained Monster's opposition because Pelmir did not file a response to the TTAB's notice of default, not because the TTAB engaged in a substantive likelihood-of-confusion analysis. *Monster Energy Company v. Pelmir Enterprise Inc.*, Opposition No. 91269391, Dkt. No. 5 (Aug. 17, 2021).

[5] "[T]he party asserting trade-dress protection must establish that its mark had acquired secondary meaning before the first infringing use by each alleged infringer." *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116 (Fed. Cir. 2018). A basic Wayback search of Pelmir's website indicates that Pelmir has been using "Monster Dollar" since at least 2015. *See* Wayback Machine, September 30, 2015 snapshot, https://web.archive.org/web/20150930231115/http://monsterdollar.net/. But again, Monster makes no effort to provide this information.

ORDER DENYING MOTION FOR DEFAULT JUDGMENT AND MOTION TO SEAL - 11

15 U.S.C. § 1125(a).

*(c) False Designation of Origin Under 15 U.S.C. § 1125(a)*

Section 1125(a)(1)(A)[6] prohibits "any false designation of origin" which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" The critical determination is whether the public is likely to be confused as to who makes what product. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008).

Just as Monster's failure to allege sufficient facts showing a likelihood of consumer confusion is fatal to its trademark and trade dress infringement claims, here too it fails to plead a plausible claim for false designation of origin under 15 U.S.C. § 1125(a). *See, e.g.*, *Growler Station, Inc. v. Foundry Growler Station, LLC*, No. SA-CV-18-0433-DOC(DFMx), 2018 WL 6164301, at *9 (C.D. Cal. July 19, 2018) ("Given that the Court found that there was not a likelihood of confusion under the trademark infringement analysis, Plaintiff does not prevail on the merits of its false designation of origin claim, which also requires a showing of likelihood of confusion.").

*(d) Unfair Competition Under the CPA and Washington Common Law*

"Washington state courts have adopted the 'likelihood of confusion' standard for common law and statutory unfair competition claims." *Multifab, Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1067 (E.D. Wash. 2015) (citing state cases). "The elements necessary to establish a likelihood of confusion for common law and statutory unfair competition claims in Washington are the same as for federal trademark infringement and unfair competition." *Safeworks, LLC v.*

---

[6] Section 1125(a) is broader in scope than Section 1114; the latter protects only registered marks, while the former "protects against infringement of unregistered marks and trade dress as well as registered marks" and "protects against a wider range of practices such as false advertising and product disparagement[.]" *Brookfield*, 174 F.3d at 1046 n.8.

ORDER DENYING MOTION FOR DEFAULT JUDGMENT AND MOTION TO SEAL - 12

*Teupen Am., LLC*, 717 F. Supp. 2d 1181, 1192 (W.D. Wash. 2010).

Because Monster failed to sufficiently state its claims for trademark infringement, trade dress infringement, and false designation of origin under the Lanham Act, it has also failed to sufficiently state its Washington common law and statutory unfair competition claims. *See, e.g.*, *Multifab*, 122 F. Supp. 3d at 1067 (concluding that plaintiff's CPA claim failed "for the same reasons its federal trademark infringement claim fails; there is no likelihood of consumer confusion.").

### (e) Summary

The Rule 8 pleading standard "does not require detailed factual allegations," but it does require more than "labels and conclusions or a formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678 (cleaned up); Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement" of claims). Monster's complaint falls short of this standard for the reasons discussed above. Because the allegations in Monster's complaint fail to sufficiently establish its claims against Pelmir, Monster is not entitled to default judgment and the Court need not address the remaining *Eitel* factors or the requested relief. *See, e.g.*, *Dureau v. Allenbaugh*, 708 F. App'x 443, 444 (9th Cir. 2018) ("Dureau . . . failed to state a claim on which relief could be granted, necessitating the denial of her motion for a default judgment." (internal citation omitted)); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (reversing entry of default judgment on RICO claim where complaint failed to state a claim for relief because the allegations concerning certain elements of the claim were "entirely general"). Accordingly, the Court DENIES Monster's motion for default judgment without prejudice.

Although the Court denies Monster's motion, it grants Monster leave to file an amended complaint within 21 days of the date of this Order. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be "freely give[n] . . . when justice so requires"); *Waters v. Mitchell*, 600 F. Supp. 3d 1177,

1188–89 (W.D. Wash. 2022) (denying motion for default judgment but granting leave to amend the complaint). If Monster amends the complaint, it may not move for default judgment on its amended complaint unless and until Pelmir fails to respond to a properly served amended complaint, and Monster obtains an order of default on the amended complaint from the Clerk. Fed. R. Civ. P. 55(a)–(b); LCR 55.[7]

**B.    Motion to Seal**

Monster seeks to seal portions of Jacob R. Rosenbaum's declaration[8] and exhibit 1 to his declaration. Dkt. No. 18 at 2. The exhibit and portions of the declaration at issue, according to Monster's counsel, contain confidential negotiated billing rates that are not available to the public or competitors. *Id.* at 2–3.

The Court, however, does not cite or refer to the sealed portions of Mr. Rosenbaum's declaration or exhibit 1 to his declaration in this Order. Rather than needlessly expend judicial resources on this motion, the Court STRIKES these documents from the record and denies Monster's motion as moot.

### III.    CONCLUSION

For the foregoing reasons, the Court DENIES Monster's motion for default judgment

---

[7] If Monster finds itself in a position to move for default judgment on an amended complaint, it must take care to provide a detailed analysis of each of its claims. *See, e.g.*, Dkt. No. 16 at 8-11 (lacking any analysis as to why the MONSTER Trade Dress is nonfunctional); *id.* (lacking any case law to support its conclusion that its MONSTER Marks and Trade Dress are arbitrary). And if Monster again requests attorney fees under the Lanham Act, it must take care to analyze whether such fees are warranted under the test set forth in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553–57 & n.6 (2014). *See SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180–81 (9th Cir. 2016) (per curiam) (making the *Octane Fitness* test applicable to fee claims under the Lanham Act). Additionally, in preparing its fee request, Monster must either (1) segregate its billing records by claim so that the Court can assess the hours spent preparing only Monster's Lanham Act claims, or (2) if Monster's state law claims are so intertwined with its Lanham Act claims that segregation would be impossible, Monster must propose a percentage downward adjustment to represent the work done on non-Lanham Act claims. *See Safeworks, LLC v. Teupen Am., LLC*, No. C08-12197, 2010 WL 3033711, at *3–4 (W.D. Wash. July 29, 2010). Monster must also comply with this Court's requirements for seeking default and default judgment as set forth in its Standing Order. Dkt. No. 21 at 8–9. Finally, the Court "will not award fees incurred as a result of . . . correcting mistakes." *Id.* at 9.

[8] Monster filed both a sealed and redacted version of Mr. Rosenbaum's declaration. *See* Dkt. Nos. 17, 20.

without prejudice, Dkt. No. 16, STRIKES docket numbers 17 and 20, and DENIES Monster's motion to seal as moot, Dkt. No. 18. The Court further GRANTS Monster leave to file an amended complaint within 21 days of the date of this Order. If, after proper service of the amended complaint, Pelmir again defaults, Monster may then file a renewed motion for entry of default, followed by a renewed motion for default judgment.

Dated this 25th day of April, 2023.

*Lauren King*

Lauren King
United States District Judge